IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Albert Rattacasa, Johnathon Hammonds, Kaleb Riggan, David Biecker, Brendan Dutchak, Benjamin Clough, Julie Evans, and Brent Carey, On Behalf of Themselves and Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>Estate Management Services, Inc. and John Milton Crabb, III<br><br>Defendants. | FIRST AMENDED COLLECTIVE ACTION COMPLAINT<br>(Jury Trial Requested)<br><br>CIVIL ACTION NO.: 9:22-cv-01251-RMG |

Plaintiffs Albert Rattacasa ("Rattacasa"); Jonathon Hammonds ("Hammonds"); Kaleb Riggan ("Riggan"); David Biecker, ("Biecker"); Brendan Dutchak ("Dutchak"); Julie Evans ("Evans"); Benjamin Clough ("Clough") and Brent Carey ("Carey") (collectively "Plaintiffs") on behalf of themselves and other similarly situated employees, by way of this Complaint, bring the below claims against their former employer Defendants, Estate Management Services, Inc. ("EMS") and John Milton Crabb, III ("Crabb') (collectively "Defendants") through their undersigned attorney, respectfully alleges unto this Honorable Court as follows:

**NATURE OF CLAIM**

1.      This is an action for violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §201, et seq, (FLSA). Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans and Carey are former Spray Technicians, Airboat Captains, and Dredge Technicians employed by Defendants. Defendants engaged in a practice of wage theft by failing to pay Riggan, Biecker,

Dutchak, Carey, Evans, Clough, and similarly situated employees time and half when they worked over 40 hours in a workweek.

2.      Plaintiffs Riggan, Biecker, Dutchak, Carey, Evans, and Clough bring this action as a collective action pursuant to 29 U.S.C. §216(b) on behalf of themselves and similarly situated employees who suffered damages as a result of Defendants' violations of the FLSA.

3.      Plaintiffs Rattacasa and Hammonds are former Managers who were not paid their commissions pursuant to their employment agreement with Defendants. Plaintiffs Rattacasa and Hammonds bring Rule 23 Class Claims on behalf of themselves as well as other Managers for unpaid wages, treble damages, and other relief under the South Carolina Payment of Wages Act ("SCPWA"), S.C. Code Ann § 41-10-10, *et seq*.

4.      Plaintiff Rattacasa also brings individual claims for Defamation, Breach of Contract, Tortious Interference with Contract, Breach of Contract Accompanied by a Fraudulent Act, Negligent Misrepresentation, Abuse of Process and Unjust Enrichment.

5.      Plaintiff Evans has causes of actions against the Defendants for violations of the Equal Pay Act of 1963 ("EPA");

## PARTIES AND JURISDICTION

6.      Rattacasa is a citizen and resident of Beaufort County in South Carolina.

7.      Hammonds is a citizen and resident of Horry County in South Carolina.

8.      Riggan is a citizen and resident of Horry County in South Carolina.

9.      Biecker is a citizen and resident of Chatham County in Georgia.

10.     Dutchak is a citizen and resident of Horry County in South Carolina.

11.     Clough is a citizen and resident of Horry County in South Carolina.

12.    Evans is a citizen and resident of Glynn County in Georgia.

13.    Carey is a citizen and resident of Horry County in South Carolina.

14.    Crabb is a citizen and resident of Glynn County in Georgia.

15.    EMS is a for-profit corporation incorporated in Georgia and registered with the South Carolina Secretary of State. EMS regularly does business within South Carolina, maintaining two offices.  Approximately one-third of the company's workforce lives and works in South Carolina.

16.    Crabb is the sole owner of EMS. He acts directly and/or indirectly in the interest of Defendants in relation to Plaintiffs as well as other employees. Crabb had the authority to exercise sufficient operational control over Plaintiffs and similarly situated employees, including the payment of their earned commissions and whether to pay them overtime.

17.    At all times, relevant herein Defendants employed Plaintiffs to work on his behalf for EMS.

18.    Rattacasa was employed at EMS in the County of Jasper, State of South Carolina. EMS has an office located at 166 Short Cut Rd, Ridgeland, SC.  A substantial part of the events giving rise to these claims occurred in Beaufort Division.

19.    This Court has subject-matter jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. §§ 201, et seq.

20.     Defendants annual sales exceed $500,000 and they have more than two employees, so the FLSA applies in this case on an enterprise basis. See 29 U.S.C. § 203(s)(1)(A). Defendants' employees engage in interstate commerce, and therefore, they are also covered by the FLSA on an individual basis.

21.     This Court has personal jurisdiction over Defendants because they are registered with the Secretary of  State of South Carolina and regularly conduct business within the State of South Carolina.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because EMS employs personnel in this District and a substantial portion of the actions and omissions giving rise to the claims pled in this Complaint substantially occurred in this District.

23.     Based upon the above, jurisdiction and venue are proper in this court and division.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans and Carey bring this action as a collective action pursuant to 29 U.S.C. §216(b) on behalf of themselves and all similarly situated employees who were misclassified as salaried employees and who were not paid overtime when they worked over forty hours in a work week. The Nationwide class consists of:

> *All current and former "Spray Technicians," "Sprayers," "Airboat Captains" "Dredge Technicians" or other job titles performing similar job duties employed by ESTATE MANAGEMENT SERVICES who were paid a salary and were not paid overtime wages for hours worked in excess of forty (40) hours per work week from [three years from the date of Court's Conditional Certification Order] to the present.*

25.     Plaintiffs Rattacasa and Hammonds also bring this action as an opt-out class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of employees, who were employed by Defendants within the three (3) years prior to the filing of this lawsuit and who were not paid their earned commission in violation of SCPWA. The Nationwide class consists of

> *All of current and former employees of Estate Management Services, Inc. who were not paid their earned commissions within three years from the filing of this action.*

4

26.    Upon information and belief, this action satisfies the requirements of the South Carolina Rules of Civil Procedure 23(a), as alleged in the following particulars:

      a.    The proposed Plaintiffs class is so numerous that joinder of all individual members in this action is impracticable;

      b.    There are questions of law and/or fact common to the members of the proposed Plaintiffs class;

      c.    The claims of Plaintiffs are typical of the claims of the proposed Plaintiff class; and

      d.    Plaintiffs will fairly and adequately protect the interests of the class. The class is sufficiently numerous that joining all members is impracticable.

27.    In addition, upon information and belief, this action satisfies one or more of the requirements of the South Carolina Rules of Civil Procedure 23(b), because the questions of law and/or fact common to the members of the proposed Plaintiff class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## **FACTUAL ALLEGATIONS**

28.    Defendant EMS is a licensed and insured aquatics contracting and land management company. It serves customers who own, manage, supervise or develop property with lakes, ponds and wetlands. https://www.ponds.org/lakeandpondmanagementcompany.html

29.    EMS currently has approximately 56 employees and its headquarters are located at 305 Indigo Dr., Brunswick, GA.

30.    According to their website, EMS also has office locations in Charlotte, NC, Charleston,

SC, Myrtle Beach, SC, Hilton Head, SC, Brunswick, GA, Jacksonville, FL, Guntersville, AL, Springfield, MO and throughout Mississippi. These offices collectively cover a territory from Wilmington, NC down through the entire state of Florida, back up to Atlanta, GA and over to Columbia, SC. Springfield covers Missouri, Kansas, Nebraska, Arkansas and Tennessee. https://www.ponds.org/lakeandpondmanagementcompany.html

31.     EMS is an S-corporation.  Crabb is 100% owner of EMS.  Crabb is president of EMS and has sole authority and control. EMS does not have a board of directors or stock holders, moreover Crabb is the alter ego of EMS.

32.     Crabb does hiring and firing for EMS. Crabb also determines how employees are paid, their schedule, their job duties, the number of hours they work and whether they are exempt or non-exempt employees.

33.     Crabb also sets the commission rates employees receive for obtaining a contract for the company.(Exhibit A Commission Rate)

34.     Crabb regularly exercised the authority to hire and fire employees, set the terms of employment for Plaintiff, and control the finances and operations of such businesses.  By virtue of such control and authority, Crabb was Rattacasa, Hammonds, Riggan, Clough, Evans, Carey, Dutchak, Biecker, and similarly situated class members' employer.

35.     Crabb also owns 25% of Estate Management Services of Missouri ("EMSM") which is a separate entity from EMS. EMSM has been in operation since 1994 and performs similar services as EMS in Kansas and Missouri.  https://lakeexperts.com/about-us/

36.     Plaintiffs and similarly situated class members worked for Defendants with the clear understanding and agreement by Defendants that their compensation would be consistent with all

6

applicable state and federal law.

## FLSA CLAIM
### RIGGAN, BIECKER, DUTCHAK, CLOUGH, EVANS AND CAREY

37.    Defendants paid Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, Carey and similarly situated employees  a fixed weekly salary based upon a forty hour work week.

38.    Notwithstanding that the majority of the time Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, Carey and similarly situated employees frequently worked in excess of forty (40) hours in a work week.

39.    Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, Carey and similarly situated employees were not compensated for the hours they worked in excess of forty (40) hours in a work week.

40.    Defendants misclassified Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, Carey, and the other similarly situated Spray Technicians, Airport Captains, Dredge Technicians  as exempt from the overtime compensation requirements of the FLSA.

41.    The U.S. Department of Labor specifically condemns an employer's non-payment of overtime: "Unless specifically exempted, employees covered by the Act must receive overtime pay for hours worked in excess of 40 in a workweek at a rate not less than time and one-half their regular rates of pay."

42.    Riggan was employed by Defendants from July 29, 2019 to January 10, 2021 then again May 24, 2021 until March of 2022 as a Spray Technician, and Airboat Captain.  He was paid a fixed rate of $440 a week, even when he worked in excess of forty hours per week.

43.    Biecker was employed by Defendants from January 15, 2021 until March 15, 2022 as a

Spray Technician, and Airboat Captain. Biecker also worked as a Dredging Techician. He was paid a fixed rate of $430 a week even when he worked in excess of forty hours per week.

44.     Dutchak was employed by Defendants from February 5, 2020 until June 4, 2021 as Spray Technician, and Airboat Captain. He was paid a fixed rate of $440 a week even when he worked in excess of forty hours per week.

45.     Clough was employed by Defendants approximately May of 2021 until January 2022 as Spray Technician, and Airboat Captain.   He was paid a fixed rate of $720 a week, even when he worked in excess of forty hours per week.

46.     Evans was employed by Defendants from 2017 until May of  2021 as Aquatic Spray Technician. She was paid a fixed rate of $550 a week, even when she worked in excess of forty hours per week.

47.     Carey was employed by Defendants from June of 2018 until October 2019 as Spray Technician, and Airboat Captain. He was paid a fixed rate of $960 a week, even when he worked in excess of forty hours per week.

48.     The primary duty of an Airboat Captain was to drive a boat while the Spray Technician sprayed chemicals on aquatic plants so rivers, ponds and lakes remained navigable.

49.     The primary duty of a Spray Technician was to spray chemicals on aquatic plants from a boat so rivers, ponds and lakes remained navigable.

50.     The primary duty of an Aquatic Spray Technician  was to spray chemicals on aquatic plants from the banks of rivers, ponds and lakes.

51.     The primary duty of a Dredge Technician was to use a hose to remove sediment from the bottom of ponds, rivers and lakes.

52.    Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, Carey and similarly situated Airboat Captains, Spray Technicians, Aquatic Spray Technicians, and Dredge Technicians  frequently worked between fifty (50)  to seventy (70) hours a week.

53.    Plaintiffs Riggan, Biecker Dutchak, Clough, Evans and  Carey as well as  similarly situated employees traveled throughout South Carolina as well as Alabama, Georgia, North Carolina, Virginia, Mississippi, Florida.

54.    Plaintiffs Riggan, Biecker, Dutchak, Cough, Evans and Carey as well as similarly situated employees were required to stay in hotels for several days at a time and work long hours in difficult weather conditions.

55.    Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans and Carey and similarly situated laborers had an employment agreement with Defendants that they would be paid for all hours worked.

56.    Crabb knew or should have known that, under the FLSA, Plaintiffs should have been paid overtime "at a rate not less than one and one-half times the regular rate" at which they were employed for all compensable hours worked in excess of forty (40) hours.  29 U.S.C. § 207(a)(1).

57.    For salaried employees, this equates to a fifty-percent overtime premium for all hours worked in excess of forty (40) in one workweek. 29 C.F.R. § 778.114(a).

58.    Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey as well as similarly situated employees were  allotted $25.00 per diem.

59.    Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey as well as similarly situated employees were paid the $25.00 per diem regardless of whether they incurred the

expenses or submitted receipts.

60.     The per diem payments functioned as compensation for work rather than as reimbursement for expenses incurred, thus the per diem benefits were improperly excluded from Plaintiffs' and similarly situated employees' regular rate of pay for purposes of calculating overtime pay.

61.     Defendants violated FLSA's recordkeeping regulations, as set forth 29 CFR Part 516. Defendants did not keep accurate records of the hours Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey and similarly situated employees worked.

62.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, and similarly situated employees, were not employed in any bona fide executive, administrative, or professional capacity.

63.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, and similarly situated employees did not have the authority to hire, fire or discipline employees, nor could Plaintiffs set or adjust employees' rates of pay.

64.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, and similarly situated employees were not allowed to exercise discretion and independent judgment with respect to matters of significance related to or on behalf of EMS.

65.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, and similarly situated employees did not direct the work of two or more employees, nor was their primary duty managing the enterprise, or managing a customarily recognized department or subdivision of EMS.

66.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, and similarly situated

employees performed day to day manual work and without them the company would not have a service to sell to their customers.

67.     Plaintiffs Riggan, Biecker, Dutchak, Clough, Evans, and Carey, complained about not being paid overtime; however, they were told because they were salaried employees they were not entitled to overtime.

**RULE 23 CLASS**
HAMMONDS AND RATTACASA

68.     Defendants had an employment agreement where <u>any</u> <u>employee</u> who brought in an account for the company would be paid a commission.

69.     Hammonds and Rattacasa and similarly situated class members had an employment agreement with the Defendants, whereby the Defendants agreed to pay them commission for the contracts they obtained for the company.

70.     Defendants had commission structure for both new accounts and existing customers based upon the project.  Each job or project sold paid a commission percentage. *(Exhibit A)*

71.     Rattacasa was employed as Chief Financial Officer and Executive Vice President from November 2, 2015 until March 23, 2022.

72.     Hammonds was employed as a Regional Manager from 2017 until January of 2022. His territory was Virginia, North Carolina and South Carolina.

73.     Hammonds' primary job duties were to manage the employees in his territory, find new clients and generate revenue for the company, order and maintain equipment and chemical inventories, and conduct a variety of work in the field.

74.     Hammonds had an employment agreement with the Defendants whereby he was paid a

base salary of $34,000 plus commission.

75.     Rattacasa had an employment agreement with the Defendants whereby he was paid a starting salary of $75,000 plus commission.

76.     Rattacasa, Hammonds and similarly situated class members generated substantial revenue for EMS; however, EMS often did not pay them their commissions per their employment agreement at the direction of Crabb.

77.     Rattacasa, Hammonds and similarly situated class members frequently complained to Crabb that they were not paid for all their commissions.

78.     Crabb significantly harmed EMS's cash flow to support his extravagant lifestyle.

79.     Rather than pay his employees the money he owed them, Crabb regularly took lavish trips and spent untold thousands of dollars on exotic saltwater fish tanks, coral, and a reverse osmosis machine.

80.     Crabb regularly purchased lavish gifts and clothing for his second wife and himself. Crabb spent thousands of dollars of company funds at Hermes, Louis Vuitton, Nordstrom, Neiman Marcus, and other high end luxury retailers.

81.     Crabb regularly took trips to Palmetto Bluff and various Five Star Resorts across the country and in the Caribbean using company funds.

82.     Crabb paid for all his groceries, meals, alcohol, personal expenses, clothing, gifts for his second wife, country club charges, hunting trips, memberships for hunting clubs, and hunting supplies out of the company accounts.

83.     Crabb co-mingled the company's business accounts with his personal accounts. Crabb paid his children's tuition, child support, and alimony out of the company's accounts. His wives

and children drove company cars paid for and insured through the company.

84.    Crabb used funds from a business line of credit to purchase his oldest daughter a car when she received her license.

85.    Crabb routinely kept all cash payments made by customers for himself.

86.    Crabb paid for his personal housekeeper/nanny by placing her on the company's payroll.

87.    While Crabb spared no expense on himself and his family, his employees struggled financially because he cheated and lied to them.

88.    Each year employees received Visa, MasterCard, or American Express gift cards as a Christmas bonus, which came predominantly from points from the company's BBT Visa and American Express.  Rattacasa was responsible for increasing the company's gift card Christmas bonuses, from $50 in 2015 to $200 and above in 2020.

89.    EMS's employees came to expect this Christmas bonus, and many relied upon it to provide Christmas gifts to their children.

90.    In December of 2021, rather than use the credit card points for employees' bonuses, Crabb used the points on gift cards for himself and to book his flights and hotel accommodations to go to the Caribbean. Thus, for the first time in years, employees received no Christmas bonuses.

91.    Crabb provided no warning or explanation to anyone that these bonuses would not be paid to them.

92.    Plaintiff Hammonds used his own money to give his crew Christmas bonuses, even though he was financially struggling because Crabb owed him thousands of dollars in unpaid commission.

93.    Crabb also lied to employees about why they had not been paid the commissions they earned and when they would be paid their commissions.

94.     Crabb also owed hundreds of thousands of dollars to several of its vendors.  In fact, some vendors refused to do business with EMS because they had so many outstanding invoices.

95.    As a result of not paying its vendors, Rattacasa, Hammonds and similarly situated class members were often unable to obtain the chemicals and other materials they needed to service their customers.

96.    Some of Hammonds' customers had paid EMS in full before work commenced; despite this fact, EMS was unable to perform the work because the company could not obtain the chemicals and equipment needed due to outstanding invoices.

97.    Rattacasa, Hammonds and similarly situated class members complained to Crabb about not being able to do the work they had promised their customers. Crabb told them to lie to the customers and tell them the items were on backorder.

98.    Hammonds regularly complained to and with other employees about how Crabb encouraged them to mislead their customers and vendors, and how that was no way to conduct business.

99.    Because Hammonds did not want to lie to his customers, and he was tired of not being paid his commission in a timely manner, he resigned in January of 2022.

100.    At the time Hammonds resigned, EMS owed him approximately $10,000 in commissions.  Hammonds asked Crabb to pay him his commission in his last paycheck. Crabb promised Hammonds he would be paid what he was owed.

101.    To date Hammonds has not been paid all his earned commission.

102.    Crabb owed Rattacasa hundreds of thousands dollars in commissions.  Rather than pay Rattacasa what he owed him, Crabb fired him and spread false and malicious statements that Rattacasa had stolen money from the company and was unfit for his profession.

**EQUAL PAY ACT**
EVANS

103.    Evans was a female Spray Technician.  She was paid substantially less than the male Spray Technicians.

104.    Evans performed equal work to her male counterparts, and she was paid substantially less.

105.    EMS paid different wages to employees of opposite sexes at the direction of Crabb.

106.    Evans performed a job that required equal skill, effort, and responsibility as her male co-workers; yet, her hourly rate was significantly less.

107.    Evans performed her job under similar working conditions as the male Spray Technicians, yet her hourly rate was significantly less.

108.    Evan was not offered 401K, while Defendants offered 401K to male Spray Technicians, even though Evans had been at the company longer than many male Spray Technicians that received 401K contributions.

109.    Evans was more experienced and had more certifications than the male Spray Technicians, yet she was paid less.

**DEFAMATION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT, BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT, NEGLIGENT MISREPRESENTATION, ABUSE OF PROCESS AND UNJUST ENRICHMENT**.
RATTACASA

110.    Prior to hiring Rattacasa, EMS did not have a CFO. The company's finances were controlled by Crabb and a bookkeeper with no prior accounting experience.

111.    EMS was in debt and had substantial cash flow problems.  Crabb needed the skills of a talented CFO to assist him with turning around the company.

112.    In 2015, Crabb entered into an agreement with Robert Half, an executive recruiter agency to hire a CFO for EMS.

113.    Crabb wanted to sell the company.  He needed a CFO to turn around the company and help him attract competitive offers.

114.    After an exhaustive search, the executive recruiter recommended that Crabb hire Rattacasa.

115.    Rattacasa graduated from Wake Forest University in 2005 with a BA in Political Science and a BA in Communication Science.  He also successfully completed a business management program in the Wayne Calloway School of Business and Accountancy at Wake Forest.

116.    Rattacasa has previously worked at Merrill Lynch in Charleston, SC. At Merrilll Lynch he worked on a team of financial advisors that specialized in assisting small and medium-sized business owners.  Rattacasa and the team managed the day-to-day cash and investment needs of small and medium-sized businesses and prepared business owners to sell or transfer their businesses.

117.    Rattacasa's skill set is assisting small to medium companies who need to "turnaround" their finances and assisting them with succession planning, which was exactly what EMS and Crabb needed.

118.     Crabb offered Rattacasa the position of EMS's Executive Vice President and Chief

Financial Officer ("CFO").

119.    Rattacasa turned down another offer to accept the position with EMS.

120.    Rattacasa had an employment agreement with Crabb that he would be paid a base salary, commissions, and receive 50% of any cost savings he made for the company.

121.    Rattacasa's primary task was to improve the company's financial standing over a period of 5-7 years to procure a sale of EMS to a third party for over 10 million dollars.

122.    When Rattacasa started, he had his work cut out for him because the company had substantial debt and cash flow problems in addition to ineffective employees and management.

123.    Rattacasa implemented a number of changes that substantially improved EMS's financial situation.  Crabb's spending only increased.

124.    Rattacasa created and implemented a digital field reporting software that expedited record keeping being sent to customers, which, in turn, expedited how quickly the company was paid. To that end, Rattacasa  changed  from paper to digital invoicing.

125.    Rattacasa implemented a corporate hotel program to save money on hotel rooms when employees traveled.

126.    Rattacasa changed the company's cell phone plan to fully unlimited plans, which quickly and significantly reduced the company's monthly cash outlay to Verizon.

127.    Rattacasa added new equipment and service offerings that were very profitable with regard to dredging.

128.    Rattacasa put EMS on two different fleet programs, first with GM, then with Ford, and started implementing diesel trucks into the fleet that could be owned and utilized longer than petrol equivalents.

129.    Rattacasa overhauled the company's insurance policies, creating a significant cost savings while closing perilous coverage gaps, including removing a waterborne exclusion.

130.    The increase in coverage allowed the company to pursue large government contracts that required higher coverage limits.

131.    The closure of coverage gaps also protected EMS in serious litigation where the company was sued for an improper herbicide treatment that destroyed a client's golf course greens.

132.    Without Rattacasa's work here, EMS would have had no insurance coverage and likely would have gone out of business considering the size of the damages.  The seven figure claim was settled and paid by the insurance underwriter.

133.    Rattacasa helped create dedicated lines of credit for the company to assist with cash flow deficiencies and procure much needed trucks and equipment.

134.    Rattacasa put most of the company's debt obligations on automatic payment, preventing repossession efforts by lenders which had occurred in the past.

135.    Rattacasa regularly engaged in AR collections efforts to collect past due balances from delinquent clients, including often driving to client locations to pick up physical checks so there was no delay in the funds hitting EMS's accounts.

136.    Rattacasa also regularly interfaced with numerous vendors to whom Crabb and EMS were indebted and successfully negotiated with the vendors to avoid collection efforts, including litigation, and eventually re-establishing normal business relations with them.

137.    Rattacasa discovered that Crabb was engaging in a number of illegal practices at his employees' expense.

138.     For instance, Crabb was knowingly violating the Fair Labor Standards Act ("FLSA")

and the Affordable Care Act. ("ACA")

139.    Rattacasa  advised Crabb  to comply with the ACA and FLSA; however, Crabb refused to follow his advice.

140.    Rattacasa helped Crabb secure a personal credit card from Bank of America for many of these personal expenses in an attempt to prevent a commingling of personal and business funds, but Crabb continued to pay personal credit card bills directly from company accounts.

141.    Crabb often instructed Rattacasa to mislead and be dishonest with EMS's vendors and employees regarding reasons for lack of payment; however, Rattacasa always tried to be honest with them, including SePro, the company's largest chemical vendor who had suspended sales to EMS multiple times.

142.    In 2021 and 2022 while SePro was threatening litigation against EMS for nonpayment of approximately $600,000 in unpaid chemical bills, Rattacasa convinced Crabb to be honest with SePro and explain that the company was for sale.

143.    Rattacasa disclosed to Sepro that Crabb was selling EMS with the hope that  knowledge of the sale would prevent litigation efforts because they would know Crabb was about to receive a large financial windfall that would help clear EMS's obligations to SePro.

144.    Prior to his termination, Rattacasa had secured short term financing for EMS from the SBAC in Savannah to provide the company some extra liquidity.

145.    Additionally, Rattacasa was working with Eight Quarter Advisors ("EQA") to figure out the working capital calculations as outlined in the LOI from SOL to have SOL absorb many of Crabb's delinquent vendor invoices so Crabb would net more money after the sale to SOL.

146.    These efforts were being made specifically with SePro's benefit in mind, since SePro was

owed the largest amount of money of any of EMS's vendors.

147.    At Crabb's request, Rattacasa wore many different hats for the company.   Crabb terminated EMS's payroll coordinator and asked Rattacasa to process payroll.

148.    Rattacasa set up a 401K plan for the employees.  However, EMS consistently fell behind in making the promised 401K matching contributions even after the company hit the $7 million revenue milestone in 2019 Crabb said would trigger the company's matching funds. EMS also became delinquent in processing regular weekly 401k contributions.

149.    Through April 24, 2022, the 401k contributions from the pay date March, 25, 2022, were not processed despite being legally required.  Rattacasa made several requests for them to be processed and his 401k funds to be released.  To date, his 401k funds have not been released to him.

150.    Crabb was more than pleased with Rattacasa's performance. He frequently praised Rattacasa and told him he wished he could pay Rattacasa more because he was worth every penny.

151.    Crabb bought Rattacasa gifts, including golf shoes and a gift certificate to Sea Island to show his appreciation.

152.    Within the first two years of his employment with EMS, Crabb was so impressed with Rattacasa's work and impact on the company that he told him he could "take off as many days" as he wished.  Throughout the rest of Rattacasa's employment with EMS, Crabb also encouraged Rattacasa to take his family with him while on work trips and to extend his stays to "enjoy himself."

153.    Crabb gave Rattacasa several raises and promised him that he would receive a minimum

10% raise every year until his base rate of pay reached $250,000, which was slated to occur in May of 2022.

154.    Because EMS had cash flow problems, Rattacasa often delayed taking his pay, raises, commissions and even used his personal credit card to pay for business expenses when the company American Express card he was issued was on hold for nonpayment.

155.    Rattacasa regularly put business expenses on his own personal card throughout his employment, including to finish the project he sold at Timuquana Country Club as well as meals for himself and employees, fuel, and lodging, including lodging while in Jacksonville for management meetings with the prospective buyers of the company.

156.    Rattacasa leveraged his entrenched and deeply valued personal relationships at Timuquana Country Club, to help EMS with its numerous cash flow issues and to boost its value for Crabb in the sales process.

157.    At several points during his tenure at EMS, Rattacasa felt taken advantage of because he was owed thousands in unpaid commissions, raises he had deferred and non-discretionary bonuses.  He sought other employment opportunities several times and conveyed that he was looking elsewhere to Crabb and other employees.

158.    When Crabb heard that Rattacasa was looking for other employment, he begged Rattacasa to stay.

159.    Crabb told Rattacasa he needed him to run the business and could not sell the company without him.  Crabb promised Rattacasa if he stayed and helped turn around the company he would receive a big payout from the sale of the company.

160.    Crabb agreed to pay Rattacasa a 6% commission if EMS was purchased for $10 million

or less and a 7% commission if EMS sold for more than $10 million.

161.    Crabb told Rattacasa he wanted him to sell the business, and he promised him that he would receive at least 6% or 7% commission.

162.    Rattacasa relied upon Crabb's promise and he agreed to stay and work tirelessly towards selling the company.

163.    In August of 2018, Rattacasa and Crabb expected an offer to purchase the company. Crabb and Rattacasa instructed Crabb's personal CPA to run the numbers on the expected offers including 6% commission he promised to Rattacasa since the valuation range was below $10 million. **(Exhibit B)**

164.    Crabb, Rattacasa and Crabb's accountant exchanged emails which included Rattacasa's 6% commission for the sale of the business. **(Exhibit B)** These emails constitute a contract. The emails solidify Crabb and Rattacasa's agreement

165.    Crabb agreed to pay Rattacasa 6% if the business sold since the amounts being negotiated were less than $10 million.

166.    The offer was $7.0 million.  Crabb turned down the offer because he wanted to sell the company for $10 million or possibly more. To that end, Crabb promised Rattacasa 7% if he could broker a sale of the company for over $10 million.

167.    Rattacasa continued to work relentlessly towards this goal.  He focused on obtaining municipal and government contracts, correctly believing it would make the company more appealing to a third party because those contracts were often large, would add significant revenue and profit to the company, and were effectively "guaranteed" money from the various government agencies.

168.    Rattacasa's bidding successes brought in millions of dollars in contracts for EMS and accounted for a very large percentage of EMS's revenue.

169.    In 2020 he won a bid with South Carolina Department of Natural Resources ("DNR"). Had EMS not won that bid, the company would have had to fire employees and downsize the airboat division.  They also would have lost favorable chemical pricing, terms, and volume discounts that provided a competitive advantage to EMS.

170.    Due to Rattacasa's incredible success in winning contracts, EMS maintained a revenue level above $7 million in 2020 and 2021.

171.    Yet Rattacasa was still owed many thousands of dollars in deferred raises, unpaid commissions and non-discretionary bonuses as per the parties' employment contract.

172.    In 2020, Crabb advised Rattacasa that he could start getting himself caught up on what the company owed him as cash came into the company.

173.    To show his appreciation for his hard work, in early 2021 Crabb leased Rattacasa an Alfa Romeo 4C Spider worth approximately $70,000.

174.    Rattacasa asked him if he got to keep it after the sale of the company on which Rattacasa was actively working.  Crabb told him  "of course, it's yours as a bonus."

175.    Crabb also gave Plaintiff a pick-up truck as compensation. Because Crabb was so pleased with the job that Plaintiff was doing, he gave him the Alfa Romeo as a bonus.

176.    In 2021, Rattacasa worked to create a competitive environment to sell EMS.  He started by engaging EQA, a small boutique investment bank, to help Rattacasa and EMS create a competitive bidding environment.

177.    Rattacasa negotiated the investment bank's fee down significantly, originally from a

percentage to a flat fee for any deal under $10 million and an additional earnout if over $10 million.

178.   EQA expressed concern to Rattacasa that Crabb would not be able to support such an extravagant lifestyle after the sale and would quickly blow through all his sales proceeds, even with an income stream of nearly $300,000 from SOLitude Lake Management ("SOL") in addition to his other assets.

179.   EMS's insurance team commented multiple times that it was clear Crabb's extravagant spending led to the company's balance sheet issues and corresponding cash flow problems, which often led to insurance payment issues and coverage lapses for non-payment, which Rattacasa fixed.

180.   Rattacasa also continued to win municipal and government contracts for EMS. Although not an exhaustive list, Rattacasa won contracts with the following municipalities; Miami-Dade County, FL; Marion County, FL; North Miami Beach, FL; City of Naples, FL; City of Orlando, FL; Orange County, FL; Collier County, FL; and Jacksonville Aviation Authority in Jacksonville, FL.

181.   Additionally he won a $7.7 million contract with the State of South Carolina which spans five years. Rattacasa hoped the state contract would attract a competitive offer to purchase the company.

182.   Despite winning these bids, Crabb did not pay Rattacasa all his earned commissions.

183.   Rattacasa was also aware that Crabb owed other employees unpaid commissions because they had complained to him.  They also complained to Crabb.  However Rattacasa needed Crabb's approval to pay outstanding commissions and Crabb rarely gave it.

184.    Rattacasa won many of the municipal contracts over one of EMS's competitors, SOL. Because the competitor lost a number of municipal contracts to EMS due to Rattacasa's bidding, the competitor expressed a heightened interest in purchasing EMS.

185.    Due to Rattacasa's effort,  SOL was the highest bidder, and EMS secured a formal Letter of Intent ("LOI") from SOL on March 10, 2022. The competitor executed a LOI to purchase EMS for $9.75 million using a valuation based on year end 2021 financials.

186.    Rattacasa instructed both Crabb and the investment bank to go back to the buyers and instruct them to recalculate their offers using trailing twelve month numbers (TTM) through February of 2022 because the earnings were much improved.

187.    The TTM earnings were significantly improved by the $400,000+ dredging and erosion control contract at Timuquana Country Club, which Rattacasa won for EMS.

188.    It is worth noting that without the cash flow from this contract, EMS would not have been able to meet many additional financial obligations, including payroll.

189.    After recalculating TTM numbers, as advised by Rattacasa, SOL improved its offer significantly from $9.75 million to $11.5 million, and eventually to $11.75 million, to which Crabb agreed as the final sales price.

190.    Rattacasa assured EQA he would do everything he could to make sure the deal went through without issue.  He also expressed to EQA that he wanted to seriously discuss EQA's job offer with him and that he was getting excited about this job opportunity.

191.    In addition to the $11.75 million purchase price, Rattacasa excluded both warehouse buildings owned by EMS from the sale of the company, which SOL agreed to lease from Crabb for about $130,000 per year.

192.   By negotiating this arrangement, Rattacasa effectively added approximately $1.5-$2 million in real estate to Crabb and the total valuation of the deal, making it worth close to $14 million depending on real estate appraisals.  It also provided Crabb with extra income he claims he desperately needs to support his lifestyle after the sale is finalized.

193.   If it were not for Rattacasa's efforts, the competitor would not have offered to purchase EMS for $11.75 million excluding the two buildings.  In fact, the buyer said that the municipal contracts that Rattacasa won constituted a determinative factor in their decision to purchase EMS.

194.   After Crabb obtained the LOI, he began to say things in an attempt to minimize Rattacasa's efforts increasing the value of EMS and in obtaining bids to purchase EMS, and his role in the sale of EMS to SOL.

195.   It was apparent to Rattacasa that Crabb did not want to honor their agreement to pay Rattacasa 7% commission for brokering the sale.

196.   Crabb called Rattacasa on Wednesday, March 23, 2022 before Rattacasa had a meeting scheduled with a municipality and told him he was terminated.

197.   Crabb told Rattacasa the reason he was being terminated was because Rattacasa  had paid himself commissions that he was not owed and had given himself raises that were not approved by him.  Crabb said Rattacasa was the reason EMS was in trouble financially and was unable to purchase supplies needed to perform work. Although Crabb made these allegations against Rattacasa, he asked Rattacasa to process the company's payroll that day shortly after he had been terminated.

198.   Moreover, at all times relevant to this complaint, Crabb had full access to all the

company's bank accounts including log in information and passwords. Consequently, had Rattacasa paid himself money he was not authorized to pay, Crabb would have been aware of it years before he terminated Rattacasa.

199.   Additionally, Crabb openly stated countless times to EMS's managers and other employees that he was in control of the company's finances, had full access to the books, the bank accounts, and the credit card accounts.  Crabb further stated that if anyone, including Rattacasa, ever did anything improper or anyone tried to steal money from the company, they could not do so because Crabb could disable all access to funds with "the push of a button."

200.   Notably at no time during the nearly seven (7) years that Rattacasa was employed by EMS did Crabb question the commissions and raises that Rattacasa had paid himself through the years or the accuracy of the company's financial records.

201.   In addition Crabb's CPA was always given access to EMS's books and had Rattacasa's login credentials to access them.  At no point in Rattacasa's tenure with EMS did the CPA ever question any of Rattacasa's work or payments to Rattacasa.

202.   Crabb told Rattacasa to comply with his requests and everything would be okay. Crabb did not inform Rattacasa what those requests were. To date, Rattacasa has not been paid any of the money owed to him, including EMS business expenses Rattacasa put on his own credit card.

203.   On March 23, 2022 Crabb's lawyer emailed Rattacasa a letter accusing him of " financial misconduct and misrepresentations" and demanding that he return a company pick-up truck that Mr. Rattacasa used as his vehicle and the Alfa Romeo 4C Spider that Crabb gave him as a bonus by 6:00 P.M. that day.

204.   Immediately after Crabb terminated Rattacasa, he openly began to make false and

malicious statements to harm Rattacasa's reputation.

205.    Crabb insinuated that Rattacasa stole money from EMS and was an unfit CFO.

206.    Shortly after he terminated Rattacasa, Crabb circulated a letter to employees in the company informing them that Rattacasa was fired and insinuating he was terminated for engaging in "irregularities."

207.    Crabb also had a Zoom call with several other employees informing them he terminated Rattacasa for financial irregularities and stated that Rattacasa's F-350 would be taken from him and be given to the Florida crew.

208.    After Rattacasa was fired, employees had their cell phones turned off and their company credit cards denied.

209.    These issues had nothing to do with Rattacasa and were because Crabb did not pay the appropriate bills. However, Crabb told employees it was because of Rattacasa that these shutdowns occurred. He told employees that Rattacasa had reported all the company phones as stolen.

210.    Crabb's statements were not based on facts when he accused Rattacasa of committing a crime of moral turpitude and that he is unfit to perform his chosen profession.

211.    Crabb's statements about Rattacasa were made outside the scope of duties and responsibilities as owner. Crabb did not have a qualified privilege to publish statements insinuating that Rattacasa had misappropriate money and was unfit to perform his job.

212.    Crabb's statements were not limited in scope  nor were they made on a proper occasion, and published to proper parties.  Rather Crabb's statements were false and malicious and were made solely to defame Rattacasa.

213.    In the March 21, 2022 executed LOI, SOL agreed to pay Rattacasa $60,000. Upon information and belief Crabb has interfered with that agreement by reporting to SOL that Rattacasa was terminated for financial irregularities; thus, they are no longer obligated to pay him this money.

214.    Crabb's statements about Rattacasa lower him in the estimation of EMS's employees, the investment bankers who were discussing employing Rattacasa after the sale, and others in the industry. Furthermore, these statements have deterred third persons from associating or dealing with Rattacasa.

215.    Upon information and belief, Crabb has interfered with many of Rattacasa's long term business relationships by making false and defamatory statements about Rattacasa.  Namely he interfered with Rattacasa's business relationship with Patrick O'Neil, Dana Stevens, and Paul Vannatta who were preparing to assist Rattacasa with his job search.

216.    On Friday, April 8, 2022, Crabb falsely reported to the Jasper County Sheriff's Office that Rattacasa had stolen the Alfa Romeo and the Ford F-350 pick-up truck that he had previously given to Rattacasa as compensation.

217.    Defendant Crabb told a Jasper County Sheriff's Deputy that he wanted to press charges against Plaintiff for taking the Alfa Romeo and the pick-up truck, even though he had previously given these vehicles to Rattacasa as compensation.

218.    Crabb misled the Jasper County Sheriff's Deputy by failing to tell him that he had previously given the Alfa Romeo and the pick-up truck to Rattacasa as compensation for a job well done.

219.    Crabb did not tell the Jasper County Sheriff's Deputy that the parties were engaged in a

civil dispute over the Alfa Romeo and the pick-up truck and wage theft claims.

220.   Crabb did not tell the Jasper County Sheriff's Deputy that he was represented by legal counsel when he reported the vehicles stolen.

221.   Crabb used the resources of Jasper County Sheriff's Office in an attempt to have Rattacasa arrested so he could obtain an advantage over Plaintiff in a civil matter.

222.   In fact, Defendant Crabb told the Jasper County Sheriff's Deputy that his lawyers instructed him to report the cars stolen.

223.   Crabb, and his counsel, were aware that the parties were actively engaged in a civil dispute over the vehicles and rather than litigate that dispute, Crabb falsely reported the vehicles stolen.

224.   On Friday April 8, 2022, Plaintiff was contacted by a Jasper County Sheriff's Deputy and told that if he did not return the Alfa Romeo and the pick-up truck, there would be a bench warrant issued for his arrest.

225.   Plaintiff immediately returned the Alfa Romeo and the pick-up truck to Crabb per the Deputy's instruction because he did not want to get arrested.

226.   After both vehicles were returned to EMS's office in Ridgeland, Crabb instructed the officers to arrest Mr. Rattacasa anyway and that he still wanted to press charges.

227.   Rattacasa could have been arrested in front of his neighbors and small children.

228.   If Rattacasa had a pending felony on his record, he would not be able to obtain comparable employment and would not have been able to support his family.

229.   Crabb further defamed Rattacasa and told EMS employees that Rattacasa misappropriated money from payroll and other EMS funds to purchase the Alfa Romeo without

Crabb's knowledge, despite Crabb leasing this vehicle for Rattacasa as a bonus for a job well done.

230.     Additionally Crabb's false and defamatory statements interfered with Rattacasa's potential employment with EQA, which was being discussed and about which Rattacasa was excited. EQA told Rattacasa that he would always have a job with them if he wanted it, and that they were impressed by all the work he had done for EMS and how well he performed in the management meetings.

231.      The Defendants' actions are a knowing and willful violation of the parties' employment contract.

232.     Upon information and belief, Crabb had planned to violate the parties' agreement.

233.     Due to the breach of his employment contract, Rattacasa has suffered and continues to suffer stress, anxiety, depression, and financial hardship.

234.     Crabb has destroyed Plaintiff's career and reputation for his own financial gain.

235.     Crabb knew of the falsity of his misrepresentations and he acted with reckless disregard of the truth or falsity.

236.     Defendants' conduct was wanton, willful, malicious, and reckless, therefore Plaintiff is entitled to punitive damages.

## FIRST CAUSE OF ACTION
### (FLSA)(CLASS CLAIMS)

237.     Plaintiffs reallege and incorporate all previous paragraphs herein.

238.     At all times relevant to this action, Defendants were "employers" under the FLSA, 29 U.S.C. § 203(d), subject to the provisions of 29 U.S.C. § 201, et seq.

239.    The positions of "Spray Technicians," "Airboat Captains," "Dredge Technicians," and "Aquatic Spray Technicians" are not exempt from the FLSA.

240.    Defendants' other job titles performing similar job duties are not exempt from the FLSA.

241.    At all times relevant to this action, Defendants "suffered or permitted" Plaintiffs to work and thus "employed" them within the meaning of the FLSA, 29 U.S.C. § 203(g).

242.    The FLSA requires an employer to pay employees the federally mandated overtime premium rate of one and a half times their regular rate of pay for every hour worked in excess of forty (40) hours per workweek. 29 U.S.C. § 207.

243.    Defendants violated the FLSA by failing to pay Plaintiffs and similarly situated class members the federally-mandated overtime premium for all hours worked in excess of forty (40) hours per workweek.

244.    Upon information and belief, Defendants have corporate policies and practices of evading overtime pay for their hourly and non-exempt salaried workers for all compensable time worked..

245.    Defendants' violations of the FLSA were knowing and willful.

246.    All similarly situated employees are victims of a uniform and company-wide policies which operate to compensate employees at a rate less than the federally mandated overtime wage rate.

247.    These uniform policies, in violation of the FLSA, have been, and continue to be, applied to all employees who have worked or are working for Defendants in the same or similar position as Plaintiffs.

248.     The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid overtime wages plus an additional equal amount in liquidated damages, costs, and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
(SCPWA)(CLASS CLAIMS)

249.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth herein verbatim.

250.     Crabb and EMS  are "employers" as defined by S.C. Code Ann. § 41-10-10(1).

251.     Crabb and EMS entered into an employment agreement with Plaintiffs and similarly situated class members to pay them commissions for the contracts they obtained for the company.

252.     S.C. Code Ann § 41-10-10(2) defines wages to mean all amounts at which labor rendered is recompensed, it includes *commissions*, vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract.

253.     Defendants owe Plaintiffs and similarly situated class members "wages" as defined in Section 41-10-10(2) of the Act, to compensate them for labor rendered to Defendants, as promised to them per their employment agreement with Defendants.

254.     In the last three years, Crabb has consistently failed to pay Plaintiffs and similarly situated class members  the wages set forth in their employment agreement.

255.     Defendants employed Plaintiffs and similarly situated class members  within the State of South Carolina.

256.    According to § 41-10-80(C), when an employer separates an employee from the payroll for any reason, the employer shall pay all wages due to the employee within forty-eight hours of the time of separation or the next regular pay day which may not exceed thirty days.

257.    Defendants failed to pay Plaintiffs and similarly situated class members all wages due, as required by Sections 41-10-40 and 50 of the Act.

258.    The Defendants failed to pay Plaintiffs and similarly situated class members per their employment agreement.

259.    Defendants' failure to pay Plaintiffs and similarly situated class members all wages due is willful, without justification, and in violation of the duty of good faith and fair dealing.

260.    Pursuant to Section 41-10-80(C) of SCPWA, Plaintiffs and similarly situated class members are entitled to recover an amount equal to three times the full amount of their unpaid wages, or their wrongfully deducted wages, plus costs and reasonable attorney's fees.

**THIRD CAUSE OF ACTION**
DEFAMATION (LIBEL AND SLANDER)
(Rattacasa)

261.    Ratacassa incorporates all allegations above into this cause of action.

262.    Crabb made verbal and written statements in reckless disregard of the Plaintiff's reputation.

263.    Crabb's statements were plain in meaning and constituted defamation per se because they insinuated Rattacasa was unfit for his profession and that he stole money from the company.

264.    Crabb's statements "are defamatory per se" because their statements were about Rattacasa's being unfit in his position as a CFO.

265.   Rattacasa was not a public official or limited-purpose public figure at the time of publication.

266.   A controversy did not exist prior to Crabb's statements. Rather the publication of the defamatory statement caused the controversy.

267.   The controversy involved private matters.

268.   Rattacasa had no more access to channels of effective communication than any ordinary private person.

269.   Rattacasa did not voluntarily assume a role of special prominence in the controversy. Crabb caused the controversy to which Rattacasa was subjected.

270.   Crabb was influenced by ill will to willfully and wantonly injure Plaintiff for his own financial benefit. Crabb knew his statements were false.

271.   Crabb acted with reckless disregard for the truthfulness of his statements about Rattacasa.

272.   Crabb was not acting in good faith, nor did he have proper motives when he made these statements. Crabb acted with malice.

273.   Crabb's defamatory statements were published by private figures, and they involved matters of private concern.

274.   As a result of Crabb's statements, Rattacasa suffered embarrassment, humiliation, and mental anguish, as well as the loss of his job and earning capacity.

275.   Crabb's statements about Rattacasa went far beyond what the occasion required, resulting in the loss of his qualified privilege.

276.    Crabb published false and malicious statements that Rattacasa took money from the company and is unfit for his profession to Rattacasa's co-workers as well as others in the industry.

277.    Crabb acted with conscious indifference to and in complete disregard of the truth of their statements and the effect that their statements would have on Rattacasa's career.

278.    Crabb intended to harm Rattacasa by his statements.

## FOR A FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (Rattacasa)

279.    Rattacasa hereby incorporates by reference each paragraph of this Complaint, as if fully set forth herein.

280.    In addition to his employment contract with Defendants, Rattacasa entered into a separate agreement with the Defendants in 2018.  Defendants agreed to pay Ratacasa if he remained employed by EMS and assisted in selling the company a 6% commission if EMS was purchased for $10 million or less and a 7% commission if EMS was purchased for more than $10 million.

281.    Rattacasa fulfilled his end of the contract. He worked tirelessly to increase revenue by winning competitive bids as well as implement cost saving measures.

282.    As per the party's agreement, Rattacasa went to substantial efforts to find a third party buyer for EMS.

283.    Rattacasa performed what was required of him in the agreement. Due to Rattacasa's efforts as CFO, the company garnered a price of $11.75 million.

284.    It is due largely to Rattacasa's efforts that EMS received such a lucrative offer.

285.    Defendants acted in bad faith by willfully breaching the employment contract.

286.    As a result, Rattacasa suffered loss of income, public embarrassment and humiliation, damage to his personal and professional reputation, and other damages that Rattacasa intends to establish through Discovery.

287.    Rattacasa has suffered a loss of income and has been otherwise injured and damaged in an amount to be determined at trial.

### FOR A FIFTH CAUSE OF ACTION
(FRAUD/FRAUD IN THE INDUCEMENT)
(Rattacasa)

288.    Rattacasa incorporates herein by reference all previous allegations of the Complaint as if fully set forth herein.

289.    Crabb made numerous false representations to Rattacasa.  Crabb agreed to pay Rattacasa a 6% commission if EMS was purchased for $10 million or less and a 7% commission if EMS was purchased for more than $10 million.

290.    Crabb made these promises repeatedly so Rattacasa would not find other employment and would work to turn around the company so it could be sold for Crabb's financial benefit.

291.    Crabb never intended to keep his promise to Rattacasa. Rather it was Crabb's intention to terminate Rattacasa before the sale of the company so he would not have to pay Rattacasa what he agreed.

292.    Crabb knew of the falsity of his misrepresentations and acted with reckless disregard of the truth or falsity.

293.    Crabb intended for Rattacasa to act upon his misrepresentation.

294.    Rattacasa was ignorant of the falsity of the misrepresentations, relied on their truth, had a right to rely thereon, and was consequently and proximately damaged thereby in an amount to be

proved at trial.

## **FOR A SIXTH CAUSE OF ACTION**
### (NEGLIGENT MISREPRESENTATION)
#### (Rattacasa)

295.    Rattacasa incorporates herein by reference all previous allegations of the Complaint as if fully set forth herein.

296.    Crabb falsely represented to Rattacasa that he would pay him a 6% commission if EMS was purchased for $10 million or less and a 7% commission if EMS was purchased for more than $10 million.

297.    However Crabb did not intend to keep this promise to Rattacasa.

298.    Crabb had a pecuniary interest in making these, because it benefited him financially if Rattacasa worked  to turn around the company and to help him find a buyer.

299.    Crabb had a duty to convey truthful information to Plaintiff. Crabb breached his duty by failing to exercise due care.

300.    Rattacasa justifiably relied on these misrepresentations.

301.    Crabb's conduct was grossly negligent, willful, wanton, malicious, and/or reckless therefore Rattacasa is entitled to punitive damages.

302.    Rattacasa suffered a pecuniary loss as a direct and proximate result of the negligent misrepresentation.

## **SEVENTH CAUSE OF ACTION**
### TORTIOUS INTERFERENCE WITH A CONTRACT
#### (Rattacasa)

303.    Rattacasa incorporates all allegations above into this cause of action.

304.    Rattacasa had a valid contract with SOL to pay him $60,000 in consulting fees.

305.   Rattacasa was in the process of being offered an employment contract with EQA.

306.   Crabb was aware of the executed contract as well as the discussions regarding an employment contract with EQA.

307.   Crabb took actions to intentionally procure the breach of both of Rattacasa's contracts..

308.   Crabb did not have a legitimate justification for intentionally interfering with Rattacasa's contracts.

309.    As a result of Crabb's conduct, Plaintiff has extensive financial and emotional damages.

310.   As a result of the Defendant's actions, Plaintiff suffered mental anguish, loss of income, public embarrassment and humiliation, damage to her personal and professional reputation, and other damages that Plaintiff intends to establish through discovery.

### EIGHTH CAUSE OF ACTION
(ABUSE OF PROCESS)
(Rattacasa)

311.   Rattacasa incorporates all allegations above into this cause of action.

312.   Crabb abused the process set forth for reporting and prosecuting crimes.

313.   Crabb utilized the process meant for reporting theft, grand larceny as well as other crimes for an improper purpose.

314.   Crabb's conduct of falsely reporting that Plaintiff stole the Alfa Romeo and the  pick-up truck was a  perversion of the criminal justice system and a waste of the Jasper County Sheriff's resources.

315.   Crabb had an ulterior purpose when he engaged in a willful act by using a process that was not proper for the proceedings.

316. Rattacasa did not steal the vehicles from Defendant. Rather, Crabb gave the vehicles to Rattacasa as extra compensation to show his appreciation to Rattacasa for a job well done.

317. Crabb misused the process set forth for reporting a crime to law enforcement by reporting Plaintiff had stolen the vehicles.

## NINTH CAUSE OF ACTION
(Unjust Enrichment)
(Rattacasa)

318. Plaintiff Rattacasa incorporates all allegations above into this cause of action.

319. If the Court or Jury determine that Plaintiff did not have a contract to broker a sale of EMS in exchange of 6% commission if the sale was $10 million or less and 7% commission if the sale is more than $10 million then a jury or Court could determine that Crabb was unjustly enriched at Rattacasa's expense.

320. Crabb was unjustly enriched at Rattacasa's expense.

321. Rattacasa worked tirelessly to procure a lucrative sale of EMS including deferring raises, bonuses, and commission so that the company would be more attractive to buyers and have more cash on hand.

322. Rattacasa negotiated the original LOI from $9.75 million to $11.75 million by acquiring additional contracts and having the buyer re-evaluate the company's revenues and earnings, especially by using TTM financials in lieu of year end 2021 financials..

323. Rattacasa also negotiated a deal that would allow Crabb to generate $300,000 income by excluding property from the sale and having the buyer lease the property from Crabb.

324.    Rattacasa's work to engage an investment bank for sell side representation, find a buyer, and negotiate the sale of EMS conferred a non-gratuitous benefit on Crabb.

325.    Crabb realized significant value from the benefit of Rattacasa's work, namely the sale price of the company increased throughout the negotiation and Crabb's ability to take possession of the two buildings, valued at approximately $2 million, which Rattacasa excluded from the sales transaction.

326.    It would be inequitable for Crabb to retain the benefit without paying Rattacasa for the value his work brought to the sale of the company and to Crabb personally.

327.    As a result of Crabb's unjust enrichment, Plaintiff is entitled to an award of damages against Crabb in amount to be determined by the trier of fact.

328.    That as a direct and proximate result of said conduct on the part of Crabb, his agents and servants, Plaintiff has been damaged as aforesaid, both actual and punitive, in such amount as a judge and jury may award.

## TENTH CAUSE OF ACTION
### (EPA)  (Evans)

329.    Plaintiff Evans incorporates all allegations above into this cause of action.

330.    Defendants have discriminated against the Plaintiff within the meaning of the EPA by providing Plaintiff with lower pay than the male Spray Technicians.

331.    Plaintiff Evans performed a job that required equal skill, effort, responsibility, and was performed under similar working conditions as Defendants' Spray Technicians.

332.    Defendants discriminated against Plaintiff Evans by subjecting her to discriminatory pay, and discriminatory denials of pay increases in violation of the EPA.

333.    The differential in pay between Plaintiff Evans and male Spray Technicians was not due to seniority, merit, quantity or quality of production, or other factor, but was due to gender.

334.    Defendants caused, attempted to cause, contributed to, the continuation of wage rate discrimination based on gender, in violation of the EPA.

335.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

336.    Plaintiff Evans requested parity with the male Spray Technicians on several occasions.

337.    Defendants willfully violated the EPA, consequently the three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

338.    The EPA provides increased civil penalties for incidents of "willful" violations. 29 U.S.C. § 216(b)(2).

339.    Because of the Defendants' conduct as alleged in this Complaint, Plaintiff Evans has suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

340.    Defendants' actions as set forth above were undertaken intentionally, and maliciously, and with utter disregard for Plaintiff' Evans' rights protected by federal law. Therefore, Plaintiff Evans is entitled to recover liquidated damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, seeks judgment against the Defendants as follows:

a)  Certification of Rule 23 Class for violations of the SCPWA;

b)  Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with

respect to the FLSA claims set forth above;

c)  Declaratory Judgment that Defendants violated the SCPWA;

d)  Declaratory Judgment that Defendants violated the FLSA;

e)  Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all FLSA Collective Class members, and permitting Plaintiffs to send notice of this action to all similarly situated employees, including the publishing of notice in a manner that is reasonably calculated to apprise said employees of their rights by law to join and participate in this lawsuit;

f)  Designating Riggan, Biecker, Dutchak, Clough, Evans and Carey as the Class Representatives for the FLSA National Class;

g)  Designating Rattacasa and Hammonds as the Class Representatives of Rule 23 Class;

h)  An award of liquidated damages;

i)  Appointing undersigned counsel as FLSA and Rule 23 Class counsel;

j)  Declaring that Defendants willfully violated the FLSA and its attendant regulations as set forth above;

k)  Granting judgment in favor of Plaintiffs and against Defendants and awarding unpaid overtime wages

l)  Declaratory Judgment that Defendants Defamed Rattacasa;

m)  Declaratory Judgment that Defendants engaged in the following as to Rattacasa: Breach of Contract, Tortious Interference with Contract, Breach of Contract Accompanied by a Fraudulent Act, Negligent Misrepresentation, and Abuse of Process;

n)  Financial Damages in the form of the pay Evans should have received for equal work, emotional harm, humiliation, physical distress, mental anguish, and liquidated damages;

o)  An award of damages as set forth under the contract between Rattacasa and Defendants;

p)  An award of compensatory damages;

q) An award of punitive damages;

r) An award of treble damages as set forth in the SCPWA;

s) An award of damages for Rattacasa's emotional distress;

t) An award of prejudgment interest;

u) An award of the reasonable attorneys' fees and costs incurred by Plaintiffs; and

v) All such further relief as the Court deems just and equitable.

**JURY DEMANDED**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

s/Marybeth Mullaney
Marybeth Mullaney (S.C. Bar #66585)
Mullaney Law
652 Rutledge Ave, Suite A
Charleston, South Carolina 2943
P: (843) 588-5587
marybeth@mullaneylaw.net

*Attorneys for Plaintiffs*

April 26, 2022
Charleston, South Carolina